**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No. 1:21-cr-452 (TFH) |
| v. | : | |
| | : | |
| KENNETH JOHN REDA, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Kenneth John Reda ("Reda") to 60 days of home detention, three years of probation, 60 hours of community service, and $500 of restitution.

**I.      Introduction**

The defendant, Kenneth John Reda, was a high school teacher and football coach when he participated in the January 6, 2021 assault on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage.

Reda pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence of 60 days of home detention is appropriate in this case because: (1) Reda professed his desire to "storm the [H]ouse during the electoral college vote certification" in advance of January 6, 2021; (2) Reda entered the Capitol

1

despite the violence and destruction visible around him; and (3) Reda minimized the violence and implausibly claimed in an interview, months later, that he had permission to enter the Capitol.

The Court must also consider that Reda's conduct on January 6, like the conduct of hundreds of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, Reda's participation in a riot that actually succeeded in halting the certification combined with Reda's apparent endorsement of the disruption makes a probation-only sentence without a period of home detention unwarranted.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

For the sake of brevity, the government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense, ECF No. 26, at 1–7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed to the violence and destruction of that day. With that backdrop, we turn to Reda's conduct.

*Kenneth Reda's Participation in the January 6, 2021 Attack on the Capitol*

In December 2020, Reda made several posts on Parler encouraging others to join him in Washington, D.C., on January 6. On or about December 19, 2020, Reda posted on Parler: "We have got to get to DC on January 6th it is IMPERATIVE every single person that VOTED for Trump has to flood DC. . . ." On or about December 22, 2020, Reda posted on Parler: "#patriots #WWG1WGA All it is IMPERATIVE that we let our elected federal officials know in both the Senate and the house that we will not be voting for them again if they do not support our President

Trump on January 6th when they are [counting] Electoral College votes this is the cleanest Constitutionally right way for Trump to win a 2nd term. WE MUST LET THEM KNOW THE THING THAT THE COVET THE MOST THIER PPWER WILL BE GONE IF THEY DO NOT SUPPORT TRUMP. . . ." On or about December 27, 2020, Reda posted on Parler: "See you in DC on the 6th assholes who don't support trump." Also on or about December 27, 2020, Reda posted on Parler: "It is time to organize PATRIOTS we need to get together and *organize against this KABAL we need to overthrow it*....they have thrown their last ditch effort to *overthrow this election* therefore this nation if we do not come together and organize we will LOSE" (emphasis added). On or about December 30, 2020, Reda posted on Parler: "Read echo understand and join us in DC on the 6th."

Further, on December 28, 2020, Reda sent a text message to Dan Shaw ("Shaw"), writing, "You better believe they will be there probably more after dark when the millions leave I want to storm the house during the electoral college vote certification."[1] Shaw responded, "Sounds good,[]strength in numbers, I doubt any soy boys will show up..." Reda replied, "I will send you a link to a pastor that has a large group attending and is meeting at congress at 11am on the 6th."

On January 5, 2021, Reda drove from his home in Florida to the Washington, D.C., area. Reda stayed in a hotel room with Shaw and Shaw's son, who had driven to Washington, D.C., from California.

---

[1] Dan Shaw was arrested on December 3, 2021, for his role in the attack on the Capitol, after having been charged by Complaint in case number 21-mj-668. On January 4, 2022, the United States filed an Information, which was assigned case number 22-cr-1, charging Shaw with four misdemeanors. Shaw's son has not been charged.

On the morning of January 6, 2021, Reda, Shaw, and Shaw's son went to the Ellipse, where they listened to speeches at the "Stop the Steal" rally. The three of them eventually walked to the Capitol, making their way to the East Front.

Videos obtained from Reda's cell phone pursuant to a search warrant depict the chaos as the mob, including Reda, advanced on the Rotunda Doors. In one video (Exhibit B), filmed at 2:11 p.m., Reda says, "on the steps right now . . . we're right here, we're that close to getting in." In another video (Exhibit C), filmed at 2:19 p.m., Reda yells, "we're not quite in yet, we're right here at the door." Below is a screenshot from the 2:19 p.m. video (Exhibit C), showing the mob outside the Rotunda Doors of the Capitol:



Less than one minute before Reda entered the Capitol, the Rotunda Doors were partially closed and the left door (from the inside looking out) had a broken pane of glass, as shown in the still image from U.S. Capitol CCTV below:

4



Reda entered the U.S. Capitol through the Rotunda Doors at approximately 3:02 p.m., as shown in the still image from U.S. Capitol CCTV below:



Once inside the U.S. Capitol, Reda made his way to the Rotunda within minutes. By approximately 3:04 p.m., Reda was amidst throngs of other rioters in the Rotunda. Around this time, officers were attempting to clear the Rotunda of rioters and rioters on the front line were fighting back against those officers. Reda was mere feet away from this violence, as shown in the still image from U.S. Capitol CCTV below:



At 3:05 p.m., Reda filmed a three-second video (Exhibit D) in which he yelled, "Let's go to the House." Reda returned to the Rotunda Lobby, where he engaged in a brief conversation with a member of the U.S. Capitol Police, as shown in the still images from U.S. Capitol CCTV below:





Reda left the U.S. Capitol through the Rotunda Doors at approximately 3:12 p.m. In total, Reda was inside the Capitol for approximately 10 minutes.

Following his participation in the riot, Reda continued to claim publicly that the day was largely peaceful, despite his knowledge that the police were overwhelmed and that at least one person had been shot.

On or about January 6, 2021, Reda posted on Parler:

> I was there at the steps of the Capital I got into the capital building there was certainly a difference in attitude by some a small number mind you than the rest of us more violent and speaking poorly to the police but I am sure the #'s were small but served to be agitators the majority wanted to get into the Capital to let the Executive branch to hear our voices and instead the built fencesand barriers and asked the police to forcibly keep us out. They did thier duty but were overwhelmed by numbers.

The same day, Reda posted on Parler: "Violence and vandalism was very minor minus the cop shooting a young girl." Finally, Reda sent the three videos described above (Exhibits B, C, and D) to two individuals via text message.

*Reda's Interview*

Reda was voluntarily interviewed by the FBI on July 23, 2021. Reda explained that he traveled to Washington, D.C., to protest an election that he viewed as rigged. Reda planned to meet Shaw, who Reda described as a friend of a friend, who was driving from California with his son. The three of them shared a hotel room on January 5, 2021, and entered the Capitol together the following day. Reda identified Shaw by name and on a still image captured from U.S. Capitol surveillance video.

On January 6, 2021, Reda, Shaw, and Shaw's son attended the "Stop the Steal" rally. They then walked to the Capitol, where a crowd had already formed. Reda heard what he described as

8

flashbangs. He described the scene as hectic. Reda denied seeing any broken glass or other signs of vandalism where he entered the Capitol.

Reda asserted that he, and others around him, had permission from the U.S. Capitol Police to enter the Capitol.[2] Reda saw a person dressed like a member of the Oath Keepers speaking with a U.S. Capitol Police officer. According to Reda, this person announced that the Capitol Police needed 1,200 people to leave the Capitol, but then others would be allowed inside. Reda said that officers permitted groups of four or five people into the Capitol at a time as others left. Reda claimed that he would not have entered the Capitol without this approval. Reda admitted, however, that the police were overwhelmed.

Reda claimed that, while in and around the Capitol, he intervened at least twice to help police officers who needed assistance.[3] Reda said that he spoke with several Capitol Police officers. One officer "was pissed" and told him to "get the f out of there."

Reda did not remember sending the text message about his desire to "storm" the Capitol. He explained that he probably sent it after having a few drinks and "watching something on TV that made [him] angry."

*The Charges and Plea Agreement*

On July 1, 2021, Reda was charged by complaint with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On July 5, 2021, he was arrested at the Melbourne Orlando International Airport in Brevard County, Florida, after returning home from a vacation to Mexico. On July 7, 2021, Reda was charged in a four-count Information with violating 18 U.S.C.

---

[2] The government has not been able to corroborate Reda's account that U.S. Capitol Police officers gave Reda or others permission to enter the building.
[3] The government has not been able to corroborate Reda's account that he assisted police officers in or around the Capitol.

§ 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On November 4, 2021, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. By plea agreement, Reda agreed to pay $500 in restitution to the Architect of the Capitol.

### III. Statutory Penalties

Reda now faces sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Reda faces up to six months of imprisonment and a fine of up to $5,000. Reda must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078–79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV. Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).

#### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of

10

the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the sounds of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at Reda's individual conduct, the Court must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Reda personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Reda's part is therefore not a mitigating factor in misdemeanor cases, nor does

it meaningfully distinguish Reda from most other misdemeanor defendants. Reda's lack of violence and property destruction is the reason he was charged only with, and permitted to plead to, a misdemeanor rather than a felony.

In the weeks leading up to January 6, Reda made several statements—both on social media and by text message—anticipating and encouraging the chaos that was to ensue that day. Reda urged others to travel to Washington, D.C., to protest the certification of the Electoral College and to "overthrow" what he called a "KABAL." Further, Reda told Shaw that he "want[ed] to storm the [H]ouse during the electoral college vote certification."

Reda's wishes came true when he actually stormed the U.S. Capitol on January 6. He entered the Capitol among a large crowd of rioters pushing forward against the already damaged Rotunda Doors. Despite Reda's claim that he did not observe any property destruction, one of the panes of glass was smashed in the very door Reda entered through. Reda asserted in an interview that he and other rioters were allowed inside in some sort of negotiated, orderly process. Video evidence, however, shows two Capitol Police officers standing guard at the Rotunda Doors, attempting to slow or impede the entry of the dozens of rioters pushing against them. Reda acknowledged that these officers were "overwhelmed." Those officers were overwhelmed by Reda, and other rioters, pushing their way into the Capitol and ignoring the clear signs that they were not allowed inside.

Once inside the Capitol, Reda yelled about wanting to "go to the House." At a minimum, Reda witnessed assaults against police officers attempting to clear the Rotunda. Although Reda walked away, and did not participate in this violence, he also did nothing to stop it.

After leaving the Capitol, Reda downplayed the violence and destruction of January 6, despite knowing that law enforcement officers were "overwhelmed" and that at least one person

12

had been shot. Reda sent videos of the chaos to two of his friends. Months later, during his interview with the FBI, Reda continued to repeat his implausible story that he had permission to enter the Capitol.

To Reda's credit, he participated in a voluntary interview with the FBI in which he identified Shaw, which helped lead to Shaw's arrest. *See* Statement of Facts at 2–3, *United States v. Daniel Shaw*, 21-mj-668 (D.D.C.). More recently, in his pre-sentence interview, Reda admitted that his actions on January 7 were a "mistake" from which he had learned a lesson.

Accordingly, the nature and the circumstances of this offense establish that a sentence of home detention, and not solely probation, is appropriate.

### B. Reda's History and Characteristics

As set forth in the PSR, Reda is married and has three adult children. He holds bachelor's and master's degrees along with a teacher's certification. Prior to his arrest, Reda was employed as a physical education teacher and football coach. His criminal history consists of a conviction for driving under the influence in 2008. The government notes, however, that Reda initially claimed that he had not used marijuana for about 25 years. Only after being confronted with a contrary prior statement did Reda admit to using marijuana just days before his arrest in this case. Reda's lack of candor calls into question his truthfulness and credibility.

By all accounts, when Reda entered the Capitol on January 6, he had a stable and positive family and professional life. But that did not prevent him from storming the U.S. Capitol and disrupting the certification of the Electoral College. As a teacher and coach, it was Reda's job to be a role model to his students and athletes. At that, he failed.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] This factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected.") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. *See* 18 U.S.C. § 3553(a)(2)(B–C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf.

14

we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69–70. The attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Reda's words demonstrate the need for specific deterrence. Reda excused and celebrated what happened on January 6, while downplaying the violence and destruction. He has claimed, implausibly and without corroboration, that he was allowed into the Capitol. But Reda acknowledged that officers were overwhelmed by rioters like him—showing that he cannot possibly believe he was allowed into the building. The requested sentence of home detention and probation will ensure that Reda remains under the Court's supervision the next time Congress convenes to certify the results of the Electoral College.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[5] Each offender must be sentenced based on their individual circumstances but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[6] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing).

The government and the sentencing courts have made meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus,

---

[5] Attached to this sentencing memorandum as Exhibit A is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

should be punished more severely. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention. Reda's case falls in the latter category.

Reda has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C.

Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case may contain the same balance of aggravating and mitigating factors present here, a few cases are instructive, particularly because the cases referenced below were assigned to the same judge as this case. First, the Court may consider the sentence imposed on Andrew Hatley, 21-cr-98, for reference, in which the Court sentenced the defendant to 36 months of probation. Mr. Hatley entered the Capitol for about 15 minutes, akin to the 10 minutes Reda was inside the Capitol. Like Reda, Mr. Hatley voluntarily interviewed with the FBI and admitted that his actions on January 6 were a mistake. Unlike Reda, however, Mr. Hatley did not make inflammatory statements on social media before or after the riot. Thus, the comparison to Mr. Hatley's case counsels for a harsher sentence in this case.

Second and third, the Court may consider the sentences imposed on Jessica Bustle and Joshua Bustle, 21-cr-238, for reference. The court sentenced Jessica Bustle to two months of home detention and 24 months of probation, and Joshua Bustle to one month of home detention and 24 months of probation. Like Reda, Jessica Bustle and Joshua Bustle entered the U.S. Capitol through the Rotunda Doors, though they were inside for approximately 20 minutes. The primary difference between their conduct was that Joshua Bustle was silent on social media while Jessica Bustle

boasted, for example, "we stormed the Capitol," they "just WALKED right in," and "People were simply making their presence known." Like Jessica Bustle, Reda sent a message about storming the Capitol, claimed to have been allowed in the Capitol, and boasted on social media after the riot about his presence. Thus, the government's requested sentence is in line with prior sentences.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that the Court sentence Kenneth Reda to 60 days of home detention, three years of probation, 60 hours of community service, and $500 of restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Reda's liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility and his cooperation with the investigation.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:     */s/ Jacob R. Steiner*
        JACOB R. STEINER
        CA Bar No. 325239
        Trial Attorney, Detailee
        555 4th Street, N.W.
        Washington, D.C. 20530
        202-924-5829
        Jacob.Steiner@usdoj.gov